111 N.J. Super. 435 (1970)
268 A.2d 534
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
RAYMOND A. GINARDI, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 22, 1970.
Decided August 7, 1970.
*437 Before Judges CONFORD, COLLESTER and KOLOVSKY.
Mr. Edward F. Kent, of the New Jersey bar, and Mr. Gerald L. Shargel, of the New York bar, admitted pro hac vice, argued the cause for appellant (Mr. Stanley C. Van Ness, Public Defender, attorney).
Mr. Wilbur H. Mathesius, First Assistant Prosecutor, argued the cause for respondent (Mr. Bruce M. Schragger, Mercer County Prosecutor, attorney; Mr. Lawrence E. Miller, Assistant Prosecutor, of counsel and on the brief).
*438 The opinion of the court was delivered by KOLOVSKY, J.A.D.
Defendant was found guilty on all counts at a consolidated jury trial of four indictments charging that on May 15, 1967 he had, while armed with a pistol, (1) kidnapped and (2) raped Susan ____, and (3) kidnapped and (4) attempted to rape Elaine ____. Two briefs have been filed on his behalf on his appeal from the judgments of conviction. One submitted by the Public Defender argues seven points for reversal; the other, a supplemental brief filed pro se, but concededly prepared by the member of the New York bar who was permitted to join in the oral argument before us, presents three additional contentions in support of the appeal.
We have reviewed the lengthy record of the trial and the arguments presented and find no basis for reversal.
The crucial factual dispute at the trial involved the identity of the offender  whether, as the State charged, it was the defendant. That the offenses described in the indictments had in fact been committed was essentially uncontradicted. The only criticism at the trial of the evidence of the elements of the offenses concerned the adequacy of the proofs as to "penetration," an essential element of the rape charge, and as to this the evidence was sufficient to support the jury's verdict.
In essence the State's proofs as to the offenses, as distinguished from its proofs as to the identity of the offender, showed that at about 9 P.M. on May 15, 1967, as Elaine was leaving Susan's automobile which had been parked briefly in front of Elaine's home in Hamilton Township, near Trenton, a man, identified by the girls as the defendant, approached with a gun in his hand, ordered Elaine back into the front seat of the auto, pushed his way into the back seat and told Susan to drive off.
Elaine testified that as they were riding she offered the intruder whatever money they had, to which he replied that that was not what he wanted, that "he intended to rape both of us." He then ordered her to get undressed. Under *439 threat of physical violence and after repeated refusals, Elaine removed her undergarments, climbed over the front seat into the back seat with the attacker, was subjected to having her "private areas" touched by this man, had the man move between her legs, but at no time "did the private parts of his body touch the private parts of [her] body." Elaine added that her attacker was brandishing his gun all the while.
The car eventually came to a stop. Elaine climbed back into the front seat and was allowed to put her raincoat on. Susan was told to get undressed and get into the back seat and Elaine was ordered to drive and she did.
Susan corroborated most of Elaine's testimony. She testified that when she got into the back seat of the car she was forced to have intercourse with her attacker, that she was penetrated, but that the penetration lasted only a matter of seconds because she picked up a can of De-Icer and hit her attacker in the face with it.
Sometime later each of the girls was forced to show the attacker some identification, at which point he threatened that "they would pay" if they reported the incident to the police. He then got out of the car, only one block from Elaine's home, and walked away. An hour and a half had elapsed since the attacker had first appeared.
We treat first with the contentions advanced on appeal which do not relate to the issue of identification.
Defendant argues that his motion at the end of the State's case to dismiss the two kidnapping indictments should have been granted because he contends there was but one criminal transaction, "the carrying away was an incident of rape and attempted rape"; "the kidnapping charged here was part of a continuous course of conduct which had as its sole aim the accomplishment of rape and attempted rape."
Defendant recognizes that we have heretofore ruled "that rape and kidnapping are separate crimes even when the kidnapping is for the purpose of the rape." State v. Johnson, *440 67 N.J. Super. 414, 418 (App. Div. 1961); see also, State v. Dunlap, 61 N.J. Super. 582, cert. den. 368 U.S. 903, 82 S.Ct. 181, 7 L.Ed.2d 97 (1961).
He argues, however, that the rule should be changed and that we should substitute therefor the "modern" interpretation of kidnapping statutes adopted by the California court in People v. Daniels, 80 Cal. Rptr. 897, 459 P.2d 225 (Sup. Ct. 1969), and by the New York court in People v. Levy, 15 N.Y.2d 159, 256 N.Y.S.2d 793, 204 N.E.2d 842 (Ct. App. 1965), and People v. Lombardi, 20 N.Y.2d 266, 282 N.Y.S.2d 519, 229 N.E.2d 206 (Ct. App. 1967).
The present California rule was stated in People v. Daniels, supra
The rule of construction declared in People v. Chessman (1951) supra, 38 Cal.2d 166, 192, 238 P.2d 1001, 1017, i.e., that "It is the fact, not the distance, of forcible removal which constitutes kidnapping in this state," is no longer to be followed. Rather, we hold that the intent of the Legislature in amending Penal Code, section 209 in 1951 was to exclude from its reach not only "standstill" robberies (e.g., People v. Knowles (1950) supra, 35 Cal.2d 175, 217 P.2d 1) but also those in which the movements of the victim are merely incidental to the commission of the robbery and do not substantially increase the risk of harm over and above that necessarily present in the crime of robbery itself. [80 Cal. Rptr., at 910, 459 P.2d, at 238]
It is immediately evident that the quoted rule is inapplicable to the factual circumstances of this case, which involved not "brief movements" of the victims but asportation of the victims for substantial distances during a period of 1 1/2 hours, during all of which time the victims faced the threat of the pistol in the assailant's hands.
The New York court itself has recently observed in People v. Miles, 23 N.Y.2d 527, 297 N.Y.S.2d 913, 245 N.E.2d 688 (1969), cert. denied 395 U.S. 948, 89 S.Ct. 2028, 23 L.Ed.2d 467 (1969):
In short, the Levy-Lombardi rule was designed to prevent gross distortion of lesser crimes into a much more serious crime by excess of prosecutorial zeal. It was not designed to merge "true" kidnappings *441 into other crimes merely because the kidnappings were used to accomplish ultimate crimes of lesser or equal or greater gravity. Moreover, it is the rare kidnapping that is an end in itself; almost invariably there is another ultimate crime. [297 N.Y.S. 2d 922, 245 N.E.2d 695]
There is therefore no reason for us in this case to undertake an evaluation of the rule adopted by the California and New York courts. (It may be noted that the Supreme Courts of Delaware, Minnesota and Kansas have found the reasoning of the New York court in People v. Levy, supra, to be unpersuasive. See Samuels v. State, 253 A.2d 201, 203-204 (Del. Sup. Ct. 1969); State v. Morris, 281 Minn. 119, 160 N.W.2d 715, 717-718 (Minn. Sup. Ct. 1968); State v. Ayers, 198 Kan. 467, 426 P.2d 21, 24-25 (Sup. Ct. 1967)).
Defendant also argues that there was error in five aspects of the court's charge although no question was raised in the trial court with respect to the first two items to be mentioned. Suffice it to say that we are satisfied that there is no justification for the criticisms directed to the instructions given by the court with respect to (1) the elements of the crime of kidnapping, (2) the evaluation of the identification testimony, and (3) defendant's alibi.
Further (4) the trial judge did not abuse his conceded discretion, State v. Wesler, 137 N.J.L. 311, 316-317 (Sup. Ct. 1948), aff'd o.b. 1 N.J. 58 (1948), in deciding not to charge the maxim "falsus in uno, falsus in omnibus." Finally (5) the court acted properly in denying defendant's request that it charge the so-called "equipoise" rule. The court's charge embodied the proper test to be applied in weighing evidence in a criminal case to determine if guilt exists, "whether it is sufficient to generate a belief of guilt beyond a reasonable doubt." State v. Ray, 43 N.J. 19, 31 (1964); State v. Fiorello, 36 N.J. 80, 87-88 (1961).
We find no prejudicial error in the method adopted by the court in furnishing the jury with the information sought by the question propounded by it during the course of its *442 deliberations. Nor was any prejudice suffered by defendant from the court's ruling on the objection made by defendant during the prosecutor's summation.
Defendant's motion, made prior to the selection of the jury, that "all witnesses, whether they be State or defense, with the exception of expert witnesses be excluded from the courtroom," was granted, but then when the court ruled that this included such members of defendant's family as would appear as witnesses, defendant withdrew his motion, reserving the right to renew it during the trial. The motion was not renewed. There is no substance in the contention now advanced that it was improper for the court to rule, before defendant withdrew his motion, that the sequestration order would apply to defendant's wife and mother, as well as to the other prospective witnesses in the case.
We turn now to the issues raised relating to the proofs as to the identity of the offender.
A description of their attacker given by the girls to the police late on the night of May 15 or in the early hours of May 16 included a description not only of his physical features, his clothes and appearance  e.g., Elaine told the police that their attacker "was very sloppily dressed and dirty and he smelled like grease or oil, it was a dirty kind of smell"  but also of the pistol he carried and the dark-colored skull cap with strings hanging down the side and the gloves he was wearing. But Elaine, when asked by the police about 3 A.M. on May 16 whether she thought she could identify the assailant if he were apprehended, answered, "I am doubtful." Later on the 16th, Detective Lieutenant Keegan and Detective Mohr of Hamilton Township had the girls look at a number of rogues' gallery photographs. No identification was made.
On the evening of May 17 the detectives took the two girls to police headquarters in Middletown Township, Pennsylvania. Since late 1962 that police department had among its equipment an item known as an "Identi-Kit." One of its police officers, Norbert Banach, was trained to use it and *443 had used it "many times." The "Identi-Kit" is used by police departments as an aid to the preparation of a sketch of a subject based on an eyewitness' description. See 20 American Jurisprudence, Proof of Facts, at 551 (1968):
Probably the most useful aid, and the one in widest use, is an invention called Identi-Kit. The kit consists of hundreds of transparent celluloid overlays on which are printed variations of the human features: hairline, nose, eyes, chin contour, mouth, etc. The eyewitness is asked to select the set that most closely resembles the subject; the overlays are assembled to form a complete facial sketch. Each overlay is numbered so that the sketch will show a row of numbers that can be transmitted by wire or telephone, enabling a distant police department to duplicate the sketch in minutes. Speed is in fact the outstanding asset of Identi-Kit; a trained operator can form the sketch in two or three minutes as opposed to the hours it requires an artist to draw one.
Identi-Kit was developed after long study of the principles of physiognomy and comparisons of hundreds of thousands of photographs of arrested persons. It is claimed that, because of consistencies in the human structure, a likeness of a subject can be constructed on the basis of only four known factors: his approximate age, weight, and height, and the one of 49 different hairlines that is closest to his own. Thus even a face mask will not prevent a rendition.
Banach testified for the State and with the Identi-Kit before him described it and explained and demonstrated the manner of its use to the jury, saying among other things:
You ask the people certain individual questions on size, height, weight and any special features they remember about a person's face and then with that you put a group of slides together to come out with a likeness similar to what they want and from that changes are made, if they don't like the eyes or they don't like the nose, they're changed until they agree on the individual slides.
He then described the separate sessions he had had with Susan and Elaine on the evening of May 17. The first girl (identified by other witnesses as Susan) finally selected slides from six categories  chin, eyebrows, lips, nose, eyes and hair. The finished composite was approved by the girl before the interview ended; according to Susan's trial testimony, *444 she was then satisfied that "it depicted the man that entered my car on May the 15th."
Banach recorded the numbers of the overlays and then restored them to the kit. The second girl (Elaine) was called in. The same procedures were followed. She was able to select only from five categories, "she could not give me a hair slide." She expressed approval of the completed plastic composite. Banach testified that the "similarity" between the slides she selected and those the first girl had selected "was surprisingly close."
The next day Banach reconstructed the composite approved by the first girl from the recorded numbers of the overlays and made two sketches thereof, adding to one of them a cap of the description given him by the second girl. On the following day, May 19, Banach gave the two sketches and a photograph of each to the Hamilton Township detectives. They, in turn, made Verifax copies thereof and distributed them to members of their police department and to neighboring police departments.
On the following Monday evening, May 22, 1967, Keegan was in charge of a "special shift" of ten police officers in five police autos, two of them unmarked, engaged in patrolling the section of Hamilton Township which adjoined Lalor Avenue, a boundary street between the Township and the City of Trenton. (The reason for the special assignment was kept from the jury; the colloquy in the absence of the jury indicated that there had been a series of crimes in the area similar to those here involved.)
At about 8:45 P.M., Keegan, who was in an unmarked car with Detective Mohr and the police commissioner, noticed an auto with its only occupant the driver, a "man [who] was a striking likeness of the sketch we carried." Keegan said the police followed the auto through several streets of the Lalor tract and then ordered it to stop. Detective Mohr identified himself to the driver as a police officer. Mohr testified that as the driver produced his driving license, he, Mohr, noticed the butt portion of a gun sticking up between *445 the front seats of the auto and, "on the right front seat, the passenger seat * * * a blue cloth helmet and a pair of tan gloves." The driver was ordered out and placed under arrest.
Keegan then approached the auto and in his trial testimony said that the butt of the pistol was "in plain view" between the driver's bucket seat and the console, and that "on the passenger's seat was like a motorcycle helmet liner, like an old fashioned aviator's hat with straps and a pair of gloves and a couple small screwdrivers."
Defendant was taken first to police headquarters in Trenton, the municipality in which he had been arrested, and booked on a complaint for carrying the pistol. He was then taken to police headquarters in Hamilton Township and booked there. Later that night a lineup was held consisting of defendant and four police officers in plain clothes. (Insofar as pertinent to the arguments advanced, the details of the lineup will be referred to later.) Susan and Elaine were brought to police headquarters and, at separate viewings of the lineup through a one-way mirror, they each identified defendant as the attacker.
At the trial both Elaine and Susan made in-court identifications of defendant. Elaine was "absolutely positive" that "defendant is the individual who forced his way into [her] car." Susan had "no doubt at all that he was the man." In addition, each identified the composites and confirmed her separate pretrial identifications of the composites and of defendant in person at the lineup. As for the gun, helmet and gloves found in defendant's auto when he was arrested: to Susan, the gun looked "exactly like the gun" carried by the attacker, to Elaine it looked "similar"; to Susan, the helmet and the gloves were "similar" to those worn by him, to Elaine, the helmet looked "very similar," the gloves "similar."
Before the end of the State's case the gun, hat and gloves were admitted into evidence, defendant admitting that those items had been found in his auto. Also admitted into evidence, *446 over defendant's objection, were the sketches of the composite prepared by Banach and photographs of each.
Defendant vehemently denied that it was he who had attacked the girls. He testified, and he was supported by the testimony of his wife, his mother, his mother-in-law and sister-in-law, that he was at home during the entire evening of May 15; that his wife had taken the family car to go bowling and that when she returned home between 11:15 and 11:30 P.M. she combed out her mother's hair and then Mr. and Mrs. Ginardi had driven Mrs. Ginardi's mother to the home of another daughter; that while at home, at about 10 P.M., defendant's sister-in-law had telephoned and had spoken to him; and that sometime between 10 to 10:30 P.M., Mr. Ginardi's mother had telephoned him from Pittsburgh to inquire about his trip back from Pittsburgh the previous day.
In rebuttal of this alibi evidence, the State offered the testimony of: a next-door neighbor who testified that she had heard the Ginardi auto drive out of their driveway at about 8:30 P.M. on May 15 and that thereafter the Ginardi house was dark except for the outside porch light, the lights outside and inside the garage and perhaps one in the kitchen; and a member of Mrs. Ginardi's bowling team who testified that on May 15 defendant had driven her and his wife to the bowling alley, had left them there and that another member of the team (who also so testified) had driven Mrs. Ginardi home after they had first stopped at a diner until about 12:15 A.M. on May 16.
Defendant denied that he ever wore greasy, oily or smelly clothes, asserting that his job involved "fairly clean work." In this aspect he was corroborated by members of his family, and in an attempt to introduce further corroboration thereof he overruled his attorney's reluctance and insisted on the following questions being asked on cross-examination of one of the members of his wife's bowling team:
Q. Now, on that night do you recall if Raymond was dirty or greasy or oily or smelled of dirt, grease or grime? A. No, I don't.
*447 Q. Did he or didn't he? A. I don't remember.
Q. To your knowledge did he ever smell like that or wasn't he usually clean? A. He was usually clean.
Defendant also attacked the suggestion that the composite sketch or picture resembled him. At the request of his attorney he donned the helmet liner while the jurors compared his appearance with that of the sketch which was being passed among them. So, too, the jury was asked by the attorney to compare defendant's nose with a sketch, which defense counsel had drawn during Banach's cross-examination, of the nose which, according to Banach, the second girl had selected. The alleged lack of resemblance between the composites and defendant was stressed in defense counsel's closing statement to the jury.
It is of interest to note that in even stronger terms the same argument was advanced by defendant's attorney in support of his unsuccessful motion for dismissal at the end of the State's case. He told the trial judge that the jury could not reasonably find from the evidence that the charges had been proven, saying, among other things:
More specifically, first of all, with regard to the identification of the defendant. You recall the testimony of several of the police detectives and that of the two complaining witnesses was that the composite sketch accurately depicted the man who attacked them. It was prepared a reasonable time after the attack, presumably while the identification features of the assailant's face and appearance were fresh in their minds. I would submit, your honor, that inasmuch as it has been represented to the trier of the facts that this composite sketch does accurately reflect the face of the attacker, that your honor could find as a matter of law that there is no resemblance between the composite sketch and my client, that there is such a disparity in appearance the matter should not be given to the jury because twelve reasonable men could not disagree.
Therefore, I would ask with regard to the composite sketch, since the identification of the defendant admittedly is one of the key issues in the case, is based in large part on the sketch and that your honor has the right and power to determine as a matter of law that there is no resemblance and that the jury would so find, that to send it to a jury would be an empty task.
*448 Defendant's testimony of his activities on May 22, 1967 just prior to his being stopped by the police, as well as of what thereafter transpired, differed sharply from the testimony which had been given by the police witnesses. He denied that he had driven through the Lalor tract and said that when he was stopped he was on his way to a bowling alley after dropping his wife at another alley at which his wife's team was to bowl. The police searched his auto over his objection; the seized items were not in plain view; the helmet liner and the screwdrivers were underneath the passenger seat, and the pellet pistol was out of sight, pushed to the floor between the driver's seat and the console.
According to defendant, the pistol was an air pellet pistol which he used as a target pistol and was in the car because that afternoon he had taken his dog, the pistol and some pellets and fired at some tin cans and kettles in a field at the Bordentown Military Academy. The gloves and the helmet liner had been given to him by his employer; similar equipment was used by employees of many other industries in the area.
Defendant also disputed the State's version of the several events, including the lineup, which followed his arrest.
Defendant does not now contend that the jury's determination that he was the attacker lacks adequate support in the proofs which we have summarized at some length. Rather, he contends that the governing law mandated the exclusion of critical parts of those proofs, specifically (1) the testimony as to the lineup identifications and (2) the composite sketches, and that their admission into evidence constituted reversible error.
Defendant contends that "judged by the totality of the circumstances the out-of-court identification procedures [the lineups in this case] were so unnecessarily suggestive and conducive to irreparable mistaken identification as to a denial of due process of law." Cf. Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); State v. Matlack, 49 N.J. 491, 498 (1967), cert. *449 den. 389 U.S. 1009, 88 S.Ct. 572, 19 L.Ed.2d 606 (1967). Our review of the record leads us to the contrary conclusion and to agree with the trial judge's rejection of the contention when it was advanced to him at the end of the State's case.
The two victims had had ample opportunity during a period of 1 1/2 hours to observe the man who had committed the offenses. The victims' separate identifications of defendant at the lineup were immediate and positive, and neither was influenced by the police in making her decision. Such influence is not to be found in the fact that the victims knew they had been summoned to police headquarters to see whether they could identify a suspect.
The lineup consisted of defendant and four police officers in plain clothes. Each testified at the trial. The details of the lineup and of their appearances were fully developed on their direct and cross-examination as well as by the direct and cross-examinations of other witnesses to the lineup.
The differences in the appearances of the various men in the lineup were only such as to go to the weight to be given the identification testimony, not to its admissibility. Cf. State v. Matlack, supra, 49 N.J. at 498.
The same observation is applicable to the other circumstances adverted to in defendant's argument, among which are: the failure to take pictures of the lineup; the absence of counsel thereat[1]; defendant's claim (denied by police) that he was forced into the lineup; the fact that the victims were not alone in the room from which they looked through a one-way mirror into the room where the men were lined up, and the alleged failure to permit defendant to select his own position in the lineup.
Nor was the admissibility of the testimony affected because, after the victims' initial identification of defendant, *450 each man in the lineup was asked to speak and put on the liner or cap, and defendant refused.
Further, there is no merit in the contention, raised for the first time in defendant's supplemental brief, that while his arrest and booking in Trenton for possession of the pistol were proper, his subsequent detention at Hamilton police headquarters was illegal, thus rendering inadmissible the testimony of the lineup identifications. It is clear from the record that the Hamilton police had probable cause to believe that defendant was the man who had attacked Elaine and Susan and were justified in arresting and detaining him. See State v. Dilley, 49 N.J. 460, 463-464 (1967).
Nor is there any substance in the argument, also presented for the first time in the supplemental brief, that admission of testimony that during the lineup defendant said, "I'm not reading anything," when asked for purpose of voice identification to read aloud a sign on the wall which the others in the lineup had read, violated his Fifth Amendment privilege against self-incrimination. See State v. King, 44 N.J. 346 (1965).
The only remaining point requiring discussion is defendant's contention that the composite sketches should not have been admitted into evidence.
At the trial defendant's objection was not limited to the introduction of the composite into evidence. When the visit with Banach was first mentioned during the direct testimony of the State's first witness, defendant objected to the introduction of any evidence with respect to the preparation and use of the composite sketches. The objection was repeated several times during the trial.
In the trial court defendant's principal objections to the testimony relating to the composite sketches was that such evidence was "irrelevant" and "self serving," although there was also the suggestion that it was incompetent.
On appeal defendant no longer contends that the evidence was irrelevant; indeed, he concedes that it had "probative value." His sole objection is to its competency. In *451 support of his argument that the "composite sketches were erroneously admitted into evidence," he cites us to People v. Coffey, 11 N.Y.2d 142, 227 N.Y.S.2d 412, 182 N.E.2d 92 (Ct. App. 1962); People v. Jennings, 23 A.D.2d 621, 257 N.Y.S.2d 456 (App. Div. 1965), New York cases referred to in State v. Davis, 91 N.J. Super. 470, 474 (App. Div. 1966), certif. den. 48 N.J. 137 (1966), as embodying the New York rule which
exclude[s] the composite picture except where the credibility of the witness is under "violent attack" or where there is a claim that the testimony at trial is a "recent fabrication." That is the same rule which governs admissibility of a prior identification by the witness. [91 N.J. Super at 475; emphasis added]
In Davis this court found it unnecessary to pass on the admissibility of composite pictures; it concluded that in any event in that case "there was no prejudicial error in the admission of the composite because of its lack of any striking resemblance to defendant and its practically worthless probative value as part of the State's case." (91 N.J. Super. at 476).
Defendant's suggestion that we follow the cited New York cases overlooks, however, (1) the caveat in Davis that the quoted New York rule "is the same rule which [in that state] governs admissibility of a prior identification by the witness" (91 N.J. Super. at 475), and (2) the fact that the New York courts exclude evidence of extra-judicial identifications of a composite sketch, see e.g. People v. Jennings, supra, not because of any inherent difference between such sketches and photographs but because in New York, contrary to the rule embodied in New Jersey case law and in Evidence Rule 63(1) (c), all forms of extra-judicial identifications are deemed inadmissible hearsay unless they fall within the limited scope of section 393-b of that state's Code of Criminal Procedure or are otherwise admissible under the "recent fabrication" exception to the hearsay evidence rule.
*452 Except to the extent relaxed by the adoption of section 393-b of the New York Code of Criminal Procedure to permit a witness to testify to a previous identification by himself  an identification which constitutes "substantive proof of identification," not limited in its use to bolstering a witness' credibility or for corroboration, People v. Spinello, 303 N.Y. 193, 101 N.E.2d 457, 460-461 (Ct. App. 1951)  New York has uniformly ruled that evidence of a prior identification is inadmissible hearsay, People v. Caserta, 19 N.Y.2d 18, 277 N.Y.S.2d 647, 648-650, 224 N.E.2d 82, 83-84 (Ct. App. 1966); People v. Cioffi, 1 N.Y.2d 70, 150 N.Y.S.2d 192, 194, 133 N.E.2d 703, 705 (Ct. App. 1956), unless the situation be one where the in-court identification of the witness is assailed as a "recent fabrication." In the latter event, New York permits proof of a prior identification, including "a sketch drawn by the police artist from details given by [the victim]," this "under the well-established exception to the hearsay rule that "`where the testimony of a witness is assailed as a recent frabrication, it may be confirmed by proof of declarations of the same tenor before the motive to falsify existed."' People v. Singer, 300 N.Y. 120, 123, 89 N.E.2d 710, 711." (People v. Coffey, 11 N.Y.2d 142, 227 N.Y.S.2d 412, 413, 182 N.E. 2d 92, 94 (Ct. App. 1962).
In People v. Caserta, supra, the New York court rejected the State's attempt to rely on the "recent fabrication" exception to the hearsay evidence rule to support the admissibility of a witness' testimony of his prior identification of defendant from photographs and held the admission of such testimony to be reversible error. The court said:
Prior to the adoption of section 393-b of the Code of Criminal Procedure in 1927, the rule had long been that it was reversible error even to admit testimony by the witness himself that he had previously identified an accused in person (People v. Jung Hing, 212 N.Y. 393, 401, 106 N.E. 105, 107; People v. DeMartini, 213 N.Y. 203, 107 N.E. 501). The cases consistently hold that this established rule is relaxed by section 393-b of the Code of Criminal Procedure only to the extent of permitting a witness to testify to a previous identification *453 by himself of the defendant in the flesh (People v. Cioffi, supra, 1 N.Y.2d p. 73, 150 N.Y.S.2d p. 194, 133 N.E. 2d p. 704).
The reasons for this rule are well understood. One of the most stubborn problems in the administration of the criminal law is to establish identity by the testimony of witnesses to whom an accused was previously unknown, from quick observation under stress or when, as here, there was no particular reason to note the person's identity. Where the opportunity for observation is limited and the opportunity and ability of the witness to identify the defendant is questionable, it is all too easy to bolster such testimony by calling a succession of witnesses who swear that they saw and heard him identify the same person upon previous occasions. This tends to give the idea to a jury that there is an impressive amount of testimony to identification when such is really not the fact. As for previous identification from photographs, not only is it readily possible to distort pictures as affecting identity, but also where the identification is from photographs in the rogues' gallery (even though the name or number on the picture has been excinded) the inference to the jury is obvious that the person has been in trouble with the law before. Such an inference is accentuated where the defendant fails to take the witness stand. [277 N.Y.S.2d, at 648-649, 224 N.E.2d at 83-84]
New Jersey and the majority of the other states which have dealt with the question have rejected the rule and philosophy of the New York court. They have adopted the view expressed years ago by Dean Wigmore, 4 Wigmore, Evidence (3 ed. 1940), § 1130, at 208, that evidence as to a prior identification of an accused is generally more reliable than the same witness' identification of the accused at the trial. State v. Williams, 39 N.J. 471, 489 (1963), cert. den. 382 U.S. 964, 86 S.Ct. 449, 15 L.Ed.2d 366 (1965); State v. Matlack, supra, 49 N.J. at 498 (1967); State v. Sinclair, 49 N.J. 525, 545-547 (1967); see also, People v. Gould, 54 Cal.2d 621, 7 Cal. Rptr. 273, 275, 354 P.2d 865, 867 (Sup. Ct. 1960); State v. Nordstrom, 244 A.2d 842, 846-847 (R.I. Sup. Ct. 1968); State v. Childers, 313 S.W.2d 728, 731 (Mo. Sup. Ct. 1958); Judy v. State, 218 Md. 168, 146 A.2d 29, 31-33 (Ct. App. 1958).
In this State,
a pretrial identification, if made under circumstances precluding unfairness and unreliability, is admissible where the person who made the identification is in court as a witness; and both the identifying *454 witness and third persons can testify about such an identification. State v. Matlack, 49 N.J. 491 (1967); State v. Williams, 39 N.J. 471, 489, 189 A.2d 193 (1963), certiorari denied 382 U.S. 964, 86 S.Ct. 449, 450, 15 L.Ed.2d 366 (1965). [State v. Sinclair, supra 49 N.J. at 545].
Further, the rule applies to pretrial identification of a photograph or photographs, State v. Matlack, supra, 49 N.J. at 497-498; and the photographs may be admitted into evidence, State v. Dancyger, 29 N.J. 76, 91 (1959), cert. den. 360 U.S. 903, 79 S.Ct. 1286, 3 L.Ed.2d 1255; State v. O'Leary, 25 N.J. 104, 115 (1957). (It may be noted that police procedures of seeking initial identifications from photographs have received the approval of the United States Supreme Court. Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)).
The rule of the cited cases has been enacted as part of the Rules of Evidence which became effective on September 11, 1967. Rule 63(1) provides in pertinent part:
A statement is admissible if previously made by a person who is a witness at a hearing, provided it would have been admissible if made by him while testifying and the statement:

* * * * * * * *
(c) Is a prior identification of a party where identity is in issue, if made under circumstances precluding unfairness or unreliability.
What has been said with respect to the admissibility of an extra-judicial identification of a photograph is fully applicable to an extra-judicial identification of a composite sketch prepared from a description given by a victim and by him identified, when the composite was completed, as a likeness of the culprit. In each case the eyewitness' statement is that what he sees, be it a photograph or a composite sketch, looks like the offender. Indeed, the procedures used in this case in preparing the composite would appear practically to eliminate the danger present in other extra-judicial identifications, whether of persons or of photographs, that the person or photograph to be selected was suggested to the eyewitness by others present at the identification.
*455 Contrary to what our dissenting colleague contends, an identification of a sketch which resembles a defendant is an identification of a party. This is the evidential value of testimony of such an identification made prior to trial  and this whether such hearsay testimony is deemed competent under a rule such as Evidence Rule 63(1) (c) or under the New York rule permitting "a sketch drawn by the police artist from details given by [an eyewitness] after the crime" to be admitted into evidence where the identification testimony of the witness at the trial is assailed as a recent fabrication. See People v. Coffey, 11 N.Y.2d 142, 227 N.Y.S.2d 412, 414, 182 N.E. 2d 92 (Ct. App. 1962), where the court said:
By his cross-examination of Nilsson and by statements to the court defendant's counsel had endeavored to show the jury that Nilsson's identification of defendant as the burglar was a "recent fabrication" contrived after defendant was arrested. To meet this claim the prosecution exercised its right to show by independent evidence that long before this alleged fabrication the witness Nilsson had taken a consistent position. This the prosecution did by proving that before he picked out defendant in a police line-up Nilsson had so described the thief to the police expert that the latter was able to make a sketch or drawing which closely resembled the actual appearance of defendant." [227 N.Y.S.2d at 414, 182 N.E.2d at 94; emphasis added]
We have not, as the dissenting opinion suggests, "fashioned another exception to the hearsay rules, as officially promulgated" in Rule 63(1) (c).
"Under Rule 63(1) of the Rules of Evidence testimony about a prior identification is admissible so long as the maker of the statement is in court as a witness" (State v. Matlack, supra 49 N.J. at 500), if the statement was made, as here, under circumstances precluding unfairness or unreliability. Nothing in the language of the rule limits such identification, as the dissenting opinion asserts,
basically [to] a prior identification of a defendant in the flesh, and, arguably, perhaps also [to] a prior identification of him from a photograph established to be an actual photograph of the defendant; *456 and we find no justification for incorporating such limitations therein. Compare State v. Matlack, supra, where the court held, without any qualification or reservation, that testimony by a detective that the victim had made an extra-judicial identification of defendant's photograph was admissible and rejected the contention that Rule 63(1) (c) did not authorize the detective's testimony, saying:
* * * we find no limitation in the rule restricting the admissibility of such testimony solely to the maker of the statement. [49 N.J. at 500]
On the record in this case, the testimony relating to the composite sketches and the composite sketches and photographs themselves were properly admitted into evidence.
The judgments of conviction are affirmed.
CONFORD, P.J.A.D. (dissenting).
I disagree only with that part of the opinion of the court which holds the admission in evidence of the police sketches was not reversible error. As I see it, these sketches were harmful hearsay, and not covered by any New Jersey exception to the hearsay evidence rule. Moreover, the patent purpose and effect of such admission was to support the credibility of the complaining witnesses on identification, and such supporting evidence is positively proscribed by Evidence Rule 20 "except to meet a charge of recent fabrication of testimony." No such charge was here made by the State, nor well could it be, the witnesses having identified defendant at the police station a week after the crime.
Every court which has considered the problem of admissibility of police composites or sketches of this general type has agreed, in principle, that such are hearsay, and not admissible unless founded on a recognized exception to the hearsay rule. State v. Davis, 91 N.J. Super. 470, 474-476 (App. Div. 1966), certif. den. 48 N.J. 137 (1966); Commonwealth v. Rothlisberger, 197 Pa. Super. 451, 178 A.2d 853 (Super. Ct. 1962); People v. Turner, 91 Ill. App.2d *457 436, 235 N.E.2d 317 (App. Ct. 1968); People v. Jennings, 23 A.D.2d 621, 257 N.Y.S.2d 456 (App. Div. 1965); People v. Coffey, 11 N.Y.2d 142, 227 N.Y.S.2d 412, 182 N.E.2d 92 (Ct. App. 1962); and see Hundhauser v. State, 44 Wis.2d 447, 171 N.W.2d 397, 398-399 (Sup. Ct. 1969). The hearsay nature of these exhibits is apparent (indeed, they are double hearsay[1]) from the account of their manufacture contained in the court's opinion. They are essentially an artificial pictorialization of the out-of-court descriptions of the culprit furnished the police artist by the victims. State v. Davis, supra (91 N.J. Super. at 474). The descriptions would themselves be hearsay and inadmissible unless saved by an authoritative exception to the hearsay rule. See Commonwealth v. Goetz, 129 Pa. Super. 22, 195 A. 144, 146-147 (Super. Ct. 1937). There were reversals of convictions for admission of such composites in the Jennings, Turner and Rothlisberger cases, all supra. There is no case holding such exhibits admissible if not within the scope of one of the stated exceptions to the hearsay rule mentioned in the next paragraph.
Such sketches have been deemed admissible where the descriptions on which they were based were made so soon after the crime as to qualify under the "res gestae" or "spontaneous utterance" exception to the hearsay rule, State v. Davis, Commonwealth v. Rothlisberger (dictum, 178 A.2d at 853), both supra, or by way of exception based upon a justified buttressing of the in-court identification testimony of a witness whose identification of defendant has been attacked by the defense as a recent fabrication. People v. Coffey, supra. As noted above, the substance of this latter exception is now codified in this State by way of Evidence Rule 20 as one of the exceptions to the absolute prohibition of any evidence to support the credibility of a witness.
*458 Admission of the sketches here involved obviously does not fall within the "spontaneous utterance" exception, the giving of the descriptions and the attendant preparation of the sketches having taken place two days after the criminal event. And see Evidence Rule 63(4). I have already noted the inapplicability of the "recent fabrication" exception.
There is no essential disagreement with any of the foregoing in the State's brief or the court's opinion. The case for admissibility of the sketches is rested substantially on Evidence Rule 63(1) (c) which allows admission of a "prior identification of a party [by one in court as a witness] where identity is in issue, if made under circumstances precluding unfairness or unreliability" (emphasis added). But it is entirely clear to me that these sketches do not constitute a prior identification of a party. They are actually identifications, in the proper sense of that word, of nothing. They are subjective picturings  and surely not of the party, Ginardi, who was unknown to the witnesses at the time  but rather of the assailant, whoever he may have been. To lightly postulate that when made they were identifications of the defendant, within the intent of Rule 63(1) (c), is to beg the whole issue of the trial, i.e., whether the defendant was in fact the criminal assailant.
It is clear from the background of the subject that in formulating Evidence Rule 63(1) (c) the court and Legislature meant, by "prior identification of a party," basically a prior identification of a defendant in the flesh, and, arguably, perhaps also a prior identification of him from a photograph established to be an actual photograph of the defendant. See State v. Matlack, 49 N.J. 491, 497-498 (1967), cert. den. sub nom. Matlack v. New Jersey, 389 U.S. 1009, 88 S.Ct. 572, 19 L.Ed.2d 606 (1967). Nothing in the history or background of the rule or its rationale remotely suggests that it was designed to cover either a prior out-of-court verbal description by a witness of an unknown culprit or a contemporaneous, subjectively assembled, pictorialization of such a verbal description. The courts of Pennsylvania, where *459 proof of prior identification of the defendant is admissible, expressly hold that that rule does not justify admission of a police sketch. Commonwealth v. Rothlisberger, supra.[2] I find no decision in disagreement with Rothlisberger.
I do not find the discussion of the New York cases set forth in the court's opinion to support its conclusion that a rule admitting proof of a prior identification of the defendant necessarily means admissibility of police sketches of the criminal assailant.
In the light of the recency of the careful and thoroughly considered joint formulation of our Rules of Evidence by the Supreme Court and Legislature, it would seem to me entirely inappropriate for this intermediate appellate court to assume, in effect, to fashion another exception to the hearsay rules, as officially promulgated, by equating admission of the exhibits in question with admission of a "prior identification of a party," or by justifying such admission by analogy to Rule 63(1) (c). Moreover, I would not subscribe to the effort even if it were appropriate for this court to undertake it. Sketches of this kind, while serviceable in police detection work, can be dangerous as evidence in court. An innocent defendant could well, by pure fortuity, resemble closely a sketch so prepared. The effect of its introduction in evidence on an otherwise doubtful jury could be devastating. Further, no consideration related to fair presentation of the substance of the State's case against a *460 defendant in such circumstances seems to require admission in evidence of such exhibits.[3]
The court does not suggest that the admission of these sketches could be regarded as harmless if incompetent. Although defendant argued to the contrary as a trial tactic before the jury, the fact remains that both the police and the young women witnesses testified as to the close resemblance between defendant and the sketches. The jury saw both. We have seen neither. It took three jury trials to produce a conviction of defendant  the obvious area of contention throughout being identity.
Accordingly, since the evidence admitted was proscribed by both Evidence Rule 63, prohibiting hearsay not within a stated exception, and Evidence Rule 20, prohibiting any evidence to support the credibility of a witness not within a stated exception, and was prejudicial, I would reverse and remand for a new trial.
NOTES
[1] The identification here was prior to June 12, 1967, so that the rule requiring the presence of counsel at a lineup mandated by United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), did not apply.
[1] The essential difference between such a sketch and the description upon which it is based is stressed in United States v. Zurita, 369 F.2d 474, 477 (7 Cir.1966) (sketch not discoverable by defendant under "Jencks" Act).
[2] The court said:

We recognize that identity is an important but uncertain fact in every case and that corroboration of testimony on identity is valuable. This is pointed out in Commonwealth v. Goetz, supra, quoting from Professor Wigmore on Evidence. For this reason proof of prior identification by the witness is admissible; but we find no support for the admission of consonant statements by the witness, even on the subject of identity, made in the absence of the person identified, except as an exception to the hearsay rule, as previously stated. Therefore, the admission of these sketches over the objection of the defendants was reversible error. There can be no doubt that it was prejudicial since the major issue in this case was that of identity. [178 A.2d, at 855].
[3] While Evidence Rule 5 states that adoption of the rules "shall not bar the growth and development of the law of evidence in accordance with fundamental principles * * *," that rule is not a rule of relaxation, and changes in, as distinguished from interpretations of, rules, are contemplated to be effected by formal action of court and Legislature, L. 1960, c. 52, Art. III, not by the decisional process. See Pressler, 1969 Rules Governing the Courts, at 891, 903.