(No. 42753.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. THOMAS A. CANALE, Appellant.

*Opinion filed May 22, 1972.*

SCHAEFER, J., dissenting.

BERNARD B. BRODY and WILLIAM J. NELLIS, both of Chicago, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and ROBERT A. NOVELLE and ROBERT L. BEST, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE GOLDENHERSH delivered the opinion of the court:

A jury in the circuit court of Cook County found the defendant, Thomas A. Canale, guilty of aggravated kidnapping, deviate sexual assault and rape. The circuit court entered judgment on the verdicts and sentenced him to the penitentiary for a term of not less than 4 nor more than 16 years on the aggravated kidnapping and rape charges, the sentences to run concurrently.

The prosecutrix, age 52, testified that she left her home at 6:20 P.M. on December 22, 1967, and entered her automobile parked on the street in front of her residence intending to drive to her sister-in-law's home. A man, wearing a black leather jacket, entered her automobile on the passenger side, pointed a gun at her, and directed her to drive around various streets until she reached a vacant area near a factory where he told her to park. He removed his trousers, underpants and jacket and forced her to perform oral, anal and vaginal copulation with him. After he had put on his trousers and underpants, he noticed some papers on the seat of the car, asked if they were hers or his, she answered they might be hers, and he threw the papers out of the window. All of the acts to which the prosecutrix testified occurred in the front seat of the car. He told her he would drive the car, would "let her off" and would then leave the car "near the school or on Crawford and Bryn Mawr." He drove to Tripp and Bryn Mawr, let her out of the car, and drove away. It was then

shortly after 7:00 P.M. She ran a few blocks to a food mart at Crawford and Bryn Mawr in Chicago where she telephoned her husband and sister-in-law. When her husband and two police officers arrived, they drove to the vacant area to look for the papers that had been thrown out of the car. They found two payroll check stubs and a payroll check dated that day and payable to defendant. The prosecutrix was taken to a hospital, examined, and was taken to her home. At approximately 9:00 P.M. a police officer came to her home and drove her to the police station. She testified that defendant was the man who had raped her and that she had identified him at the police station. Her automobile was found at Kimball and Catalpa. The keys were in the ignition, her purse was in the car and nothing was missing.

Defendant, age 20, testified that he lived with his parents, three younger brothers and a sister. He was employed at a clothing factory and had worked all day on December 22, 1967. That morning he was given his regular weekly pay check and a vacation pay check. He cashed one of the checks in the building where he worked. He put the two check stubs and the remaining check into his left rear pocket. He left work at the usual time, approximately 4:50 P.M., went directly home, arriving there at about 5:40 P.M., and remained there until the police came at 8:30 or 8:45 P.M. At about 6:15 P.M. shortly after the family had finished eating dinner he had noticed that his check and check stubs were missing. Defendant's mother testified that her son had arrived home at approximately 5:40 P.M. and was there until the police arrived.

As grounds for reversal defendant contends that the testimony of the complaining witness in identifying him as her assailant was the product of his illegal arrest and detention and that his constitutional rights to counsel and due process of law were violated. He argues first that the trial court refused to conduct an "identification hearing" and in failing to do so committed reversible error.

The record shows that after the jury had been selected, impaneled and sworn, and before opening statements were made, defense counsel stated: "*** and before the opening statements, after the jury has been sworn, I would respectfully ask the Court on a motion to suppress to inquire into the fairness of the identification of this particular defendant the facts would reveal that there wasn't any particular line-up, Judge, and this is in connection with the philosophy enunciated in *Stovall, Wade* and *Gilbert.*" The court told counsel he "ought to file the proper motion." In the ensuing colloquy it appears to have been agreed that the consideration of the question by the court should be held in abeyance "until it comes up during the course of the trial."

In direct examination the prosecutrix testified that when she went to the police station at approximately 9:00 P.M., she walked past the open door to a room in which she saw defendant standing, alone. She said to the officer with her, "That is him." Defense counsel objected stating, "I want to renew my motion again, Judge, that I made outside the presence of the jury as to identification." The court overruled the objection. At the conclusion of her testimony defense counsel moved to suppress the identification testimony and the court denied the motion.

Citing *People v. Dennis, 47 Ill.2d 120,* the People argue that the motion was "*** tardy and was never presented to the trial court in a proper written motion ***." Good trial practice would require that a motion to suppress be in written form, but in the absence of such requirement in the statutes or in our rules we do not hold that a written motion is mandatory. Good trial practice, however, would require that in the absence of a written motion there be an offer of proof from which the trial judge could have determined whether, as contemplated by *People v. Dennis,* this was an "appropriate case" (47 Ill.2d 120, at 127) for such a hearing. Although here there was neither a written motion nor an offer of proof, the record

contains the testimony of the prosecutrix, the police officers and the defendant with respect to what occurred in the police station prior to and at the time the identification was made. No contention is made that, had a hearing been held, other or additional testimony might have been adduced. We have examined the testimony and we hold that assuming, *arguendo,* that the trial court erred in refusing to hold a hearing, the error was harmless.

Defendant contends that because his arrest and detention were illegal, the prosecutrix's identification testimony was "a product of the unlawful seizure of his person and consequently all testimony relating thereto was improperly admitted into evidence against him," and argues that at the time of his arrest there were no reasonable grounds to believe that he had committed an offense. Further, he argues, his detention was illegal because, until after the impermissibly suggestive identification by the prosecutrix, he was not told the nature of the charge.

The record shows that the prosecutrix told the police she had just been raped, told them where the crime had been committed, and that the man had thrown some papers out of the window of the car. The testimony shows that when she and the police went to the scene, in a vacant area comprising approximately 5 acres, they found two check stubs bearing his name and a check payable to defendant. This evidence shows that at the time of the arrest the police officers knew of reasonable grounds to believe defendant had committed an offense.

Defendant argues that this confrontation with the prosecutrix at the police station, which occurred before he was represented by counsel "was so wanting in fairness as to deprive him of due process of law." The People contend that the confrontation, under the circumstances in which it occurred did not require the presence of counsel and did not violate defendant's right to due process. Although defendant testified that he was standing in the room alone,

that the door was closed, and that when the door was opened he saw the prosecutrix standing in the hall with several police officers, the record contains sufficient testimony to support the People's contention that the prosecutrix was being escorted to the office of the watch commander at the police station and that her view of the defendant was coincidental. The record does not support defendant's contention that the police officers intended and planned the confrontation, or that they had suggested to the witness the identity of the defendant.

We have considered defendant's argument based upon *Davis v. Mississippi, 394 U.S. 721, 22 L.Ed.2d 676, 89 S.Ct. 1394,* and find no basis in the record to support the contention that the arrest here was of the "investigatory" nature which *Davis* proscribes. The record does not support the arguments based on alleged *Wade-Gilbert (United States v. Wade, 388 U.S. 218, 18 L.Ed.2d 1149, 87 S.Ct. 1926; Gilbert v. California, 388 U.S. 263, 18 L.Ed.2d 1178, 87 S.Ct. 1951)* violations and presents no reason for us to reconsider at this time, as defendant urges us to do, our decision in *People v. Palmer, 41 Ill.2d 571.*

The only attack on the in-court identification of defendant is made in support of the contention that defendant was not proved guilty beyond a reasonable doubt. Defendant argues that "the circumstances surrounding the attack did not afford her a favorable opportunity for a clear and positive identification of the defendant as her assailant." The prosecutrix testified that the place where the man entered her car was well lighted and that the place where the offense was committed was approximately 60 feet from the wall of a factory building on which there were lights. She testified further that she had ample opportunity to see her attacker as she drove to the scene and when he drove her car after the offense was committed. The identification testimony was sufficient to support the judgment.

Defendant contends next that the court erred in

admitting into evidence hearsay testimony so prejudicial as to require reversal. The court permitted a police officer, over objection, to testify that "the victim showed us where this attack had taken place" and also permitted him, over objection, to testify that he recognized the People's exhibit comprised of the check stubs and check as the objects "that we found where [the prosecutrix] showed us." This testimony was properly admitted. *Stevens v. People, 158 Ill. 111.*

The officer was also permitted to testify, over objection, that at the police station he told the prosecutrix "that we had arrested a suspect *** and that I would like her to view this subject and either identify him in my presence and in his presence." The following ensued:

"Q. And what, if anything, did she say to you?

A. She said she had observed—when she came into the station she had already seen the man that had attacked her.

MR. BRODY: Judge, let there be an objection and let there be a motion for a mistrial, so that the record will properly reflect my feeling here.

THE COURT: Motion for a mistrial overruled.

MR. DIVITO: Proceed, Sergeant.

THE WITNESS: I asked her at that time if she was sure, and she said yes. I then escorted her into the room, where Mr. Canale was and she then—

MR. BRODY: Objection, Judge.

THE COURT: That is all. You have said enough."

The admission of this testimony was error. *(People v. Denham, 41 Ill.2d 1; People v. Harrison, 25 Ill.2d 407; People v. Krejewski, 332 Ill. 120; People v. Lukoszus, 242 Ill. 101.)* We hold, however, that in view of the positive identification made by the prosecutrix and the corrobora-

tive circumstances of the finding of defendant's papers at the scene, the error does not require reversal.

It is next contended that the court erred in permitting a detective to testify with respect to the laboratory report of a fingerprint found on the outside of the window of the driver's side of the prosecutrix's automobile. Although this testimony was clearly hearsay and should not have been admitted, the witness stated that the fingerprint was not that of the defendant, and we hold the error to have been harmless.

Defendant contends next that improper closing argument was so prejudicial as to require reversal. The assistant State's Attorney commented on the failure of the defendant to produce members of his family other than his mother to testify in support of his alibi. The court sustained an objection to the argument and instructed the jury to disregard it. Under the circumstances, viewed in the context of the argument in its entirety, reversal is not required.

Defendant contends next that the jury's verdicts were the product of a coercive admonition by the trial judge. The record shows that the jury retired to deliberate at 1:30 P.M. At 6:46 P.M. the jury foreman, in open court, with the jury, the defendant and counsel present, advised the trial court that the jury had not been able to reach a verdict. After some discussion between court and counsel outside the hearing of the jury as to whether the jury should be permitted to deliberate further, be sequestered for the night or permitted to disperse and return in the morning, the following ensued:

> "THE COURT: Mr. Foreman, I will ask you one more question. Did you say, or I am asking you this, does it appear to be hopeless of your reaching a verdict if you were to further continue to deliberate?
>
> A JUROR: I can't honestly answer that, your Honor.
>
> THE COURT: Well, I'll let you go back and

deliberate longer. I wanted to get this information. If it's hopeless, why, there would be no other alternative. But if you think you can reach a verdict, why, I'll let you go to it. All right."

Approximately one hour later the jury returned to the court room and the following ensued:

"THE COURT: Mr. Foreman, you have not been able to reach a verdict?

A JUROR: No, sir, we have not.

THE COURT: Does there seem to be a possibility of your reaching one?

A JUROR: Yes, I—

THE COURT: Within a reasonable time?

A JUROR: I believe we could, in my best opinion.

THE COURT: You think you could reach one?

A JUROR: I would like to try once more, your Honor."

Following further discussion between court and counsel outside the hearing of the jury the court said: "All right. You can go back and try again. Let me say this. Jurors, when they go in to deliberate, ought to be able to exchange ideas. There ought to be discussions, listening to the other side, the other side listening to you, and maybe by doing this, one side or another may think that they are wrong. Sometimes when you discuss it, you find you have a misunderstanding about something. Discuss it fairly with the others so that you, if possible, can come up with a verdict, if you do not do violence to your opinion." Although not reflected by the record defense counsel states that the verdicts of guilty were returned approximately 30 minutes later.

In support of his contention defendant cites *People v. Richards*, 95 Ill.App.2d 430. In that case the foreman of the jury announced that his group was "hopelessly deadlocked." The trial judge then gave an *"Allen* type"

instruction *(Allen v. United States, 164 U.S. 492, 41 L.Ed. 528, 17 S.Ct. 154)*, the jury retired and returned 18 minutes later with a verdict of guilty. The appellate court discussed this type of instruction at considerable length and was critical of its "heed the majority" theme and its emphasis on "the futility of a retrial of the issues." It concluded that the giving of the instruction was an abuse of discretion.

Here the jury was not "hopelessly deadlocked." On the contrary, the jury foreman, before the admonition was given, indicated that a verdict was possible within a reasonable time. Furthermore, the admonition did not have a "heed the majority" theme or mention a retrial of the issues. The trial court's admonition to the jury was not error.

Citing *People v. Levy (1965), 15 N.Y.2d 159, 256 N.Y.S.2d 793, 204 N.E.2d 842,* defendant contends that the conviction on the charge of aggravated kidnapping must be reversed for the reason that the confinement and asportation of the prosecutrix were incidental to the rape.

In *Levy,* as a couple named Mosler drew up in front of their home, two armed men entered their automobile. While one of the robbers drove, the other took the woman's jewelry and the man's wallet and they then left the car. The length of the drive was 27 city blocks and took 20 minutes. The two robbers and a co-conspirator were each convicted and sentenced to 20 years to life for kidnapping. Each of them was also convicted of robbery for which one was sentenced to a term of 15 to 30 years, another 15 to 25 years and the third 10 to 11 years. The Court of Appeals of New York, by a 4 to 3 vote, reversed the kidnapping convictions and unanimously affirmed the robbery convictions.

In reaching its decision the New York court first noted that the minimum penal sentence for kidnapping is 20 years to life, as compared with rape which carries a maximum sentence of 20 years, and robbery which carries

a maximum sentence of 30 years. It then observed that the statutory definition of kidnapping would usually encompass crimes of rape and robbery since detention or confinement usually accompany these crimes. The court concluded that the legislature did not intend the broad definition given to the crime of kidnapping to cover the restraints which are incident to and an integral part of crimes such as robbery and rape.

The apparent rationale and purpose of *Levy* was to prevent, in an excess of prosecutorial zeal, the elevation of the lesser crimes, under New York law, of rape and robbery to the more serious crime of kidnapping. *(People v. Miles (1969), 23 N.Y.2d 527, 297 N.Y.S.2d 913, 245 N.E.2d 688, cert. denied (1969), 395 U.S. 948, 23 L.Ed.2d 467, 89 S.Ct. 2028.)* Unlike New York, aggravated kidnapping is not, under Illinois law, a more serious offense than rape or robbery. The penalty provided for aggravated kidnapping other than for ransom was an indeterminate sentence of not less than 2 years (Ill.Rev. Stat. 1969, ch. 38, par. 10—2(b)(2)), for rape an indeterminate sentence of not less than 4 years (ch. 38, par. 11—1(c)), for robbery a sentence of 1 to 20 years (ch. 38, par. 18—1(b)), and for armed robbery an indeterminate sentence of not less than 2 years. The statutory pattern which produced the *Levy—Lombardi* doctrine in New York (see also *People v. Lombardi (1967), 20 N.Y.2d 266, 282 N.Y.S. 519, 229 N.E.2d 206)* does not exist in Illinois.

Other opinions which have considered the *Levy* rule in connection with rapes or assaults have dwelt primarily on the distance the victim was moved and the length of time she was detained. *State v. Ayers (1967), 198 Kan. 467, 426 P.2d 21; State v. Morris (1968), 281 Minn. 119, 160 N.W.2d 715; Samuels v. State (Del.Sup.Ct. 1969), 253 A.2d 201; Lester v. State (1970), 9 Md.App. 542, 266 A.2d 361;* and *State v. Ginardi (1970), 111 N.J. Super. 435, 268 A.2d 534,* all rejected the rule and affirmed kidnapping convictions. In *Ayers* the rape victim was

asported 11 feet and in *Morris* the victim was moved only 100 to 150 feet and the assault lasted only 5 minutes.

In *People v. Bishop, 1 Ill.2d 60,* the accused forced the victim to drive him over various streets and roads for a period of 4 hours, robbed him of money, jewelry and his automobile, and released him. This court rejected the defendant's contention that there can be no secret confinement in an automobile in motion on the highway. In *People v. Landis, 66 Ill.App.2d 458,* the appellate court affirmed a conviction of aggravated kidnapping where the defendant forced his way into a woman's car at gun point, drove around the immediate vicinity, robbed her and attempted to rape her, and in *People v. Masterson, 79 Ill.App.2d 117,* a conviction for aggravated kidnapping was affirmed where the defendant and a companion forced two girls into their car and later raped them while driving around various country roads.

The evidence that the prosecutrix was driven some distance from her home and confined for a period of 45 minutes during which she was raped supports the conviction for aggravated kidnapping.

We find no reversible error and the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*

MR. JUSTICE SCHAEFER, dissenting:

The prosecutrix testified that before her assailant drove the car away from the place where the sexual offenses took place, he asked her if some papers on the front seat were hers or his, "and I said, 'Well, they might be mine. They might be receipts from a delivery, and he picked them up and threw them out of the car.' " After she was let out of the car, she returned at once to the scene of the offense, with her husband and two police officers. There Officer Bickel found "three pieces of paper, two check stubs and a check itself."

To find the defendant guilty it is necessary to believe

that after committing the crimes he threw his own uncashed payroll check bearing his name and two payroll check stubs, readily identifiable as his, out of the car at the scene, thus providing evidence that was sure to lead the police to him. On the other hand, if someone else committed the offense, making sure that those documents were left at the scene of the crime would provide the criminal with an excellent defense. The defendant testified that he first missed the stubs and check when he reached in his pocket to give the check to his mother after dinner. His mother corroborated his testimony.

Identification of the wrongdoer thus became critically important. The defendant was not identified in a lineup. His oral motion for a hearing as to the admissibility of the police station identification was denied, as the majority opinion points out. At the trial, Officer Bickel testified that after the defendant's check had been found and the defendant had been arrested and taken to the police station, he went to the home of the prosecutrix and brought her to the station. He testified that on the way he "probably" told her that an arrest had been made and that someone was at the police station for her to identify. At the station, on their way to the watch commander's office, they passed the room in which, Officer Bickel testified, were the defendant, Sergeant Conliss and a detective. The door was open, and Bickel told Sergeant Conliss that this was Mrs. ———. "She hesitated and we kept walking towards the watch commander's office."

The majority justifies this conduct on the ground that her view of the defendant was "coincidental," and that "[t]he record does not support defendant's contention that the police intended and planned the confrontation, or that they had suggested to the witness the identity of the defendant." As to the latter observation, I think that the record does show that the police had suggested to the witness the identity of the defendant. Just how the defendant could have gone about showing that the

confrontation was "intended and planned" is not readily apparent. The law does not impose any such burden upon a defendant.

At 6:46 P.M., after the jury deliberated for five hours and 15 minutes, the foreman advised the court that the jury was unable to reach a verdict. The following colloquy then took place:

> "THE COURT: Do you think if you were permitted to continue your deliberation you will be able to reach a verdict?
>
> THE JUROR: I can't answer that briefly, Your Honor. There is doubt involved, and there's just not enough to go on that we could——".

Thereafter the jury was told to return for further deliberation. An hour later the jury was again returned into open court and the foreman again advised the court that they had been unable to reach a verdict. The court instructed the jury to go back and try again. Only then was the verdict of guilty returned.

In my opinion the evidence did not establish the defendant's guilt beyond a reasonable doubt.